Michael Witry, ISB #7960
**Intermountain Fair Housing Council**
4696 W Overland Rd, Ste 140
Boise, ID 83706
(208) 383-0695
Fax: (208) 383-0715
mwitry@ifhcidaho.org

Christopher Brancart, *pro hac vice*
**Brancart & Brancart**
PO Box 686
Pescadero, CA 94060
(650) 879-0141
Fax: (650) 879-1103
cbrancart@brancart.com

*Attorneys for Plaintiff*

## In the United States District Court

## for the District of Idaho

| | |
|---|---|
| **Brian Hill, Anne Hill, and Intermountain Fair Housing Council, Inc.**<br><br>Plaintiffs,<br><br>v.<br><br>**River Run Homeowners Association, Inc.,**<br><br>Defendants. | Case No. _____<br><br><br><br>**Complaint** |

   Plaintiffs Brian Hill and Anne Hill, along with the Intermountain Fair Housing Council, sue the River Run Homeowners Association, Inc., for housing discrimination against families with minor children based on their familial status.: Plaintiffs allege that Defendant discriminates against families with minor children by imposing and posting rules that unreasonably restrict the activities of minor children, with the purpose or effect of excluding or otherwise discriminating against families with children from the River Run Subdivision in Boise.

### I. Jurisdiction and Venue

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, and 42 U.S.C. § 3613.

2. Venue is proper in this Court because the events or omissions giving rise to these claims occurred in the District of Idaho.

## II. The Parties

3. Plaintiffs Brian Hill and Anne Hill ("the Hills") are now, and have at all times relevant to this complaint been, residents of Ada County, Idaho. At all times relevant to this complaint, they owned the house located at 2017 South White Pine Lane, Boise, Idaho (the "Pine Lane House"), which is within the River Run Subdivision. They are married and are the parents of three minor children: S.H., M.H., and D.H. They also have a minor nephew, S.M., who has autism and is a frequent visitor to their house.

4. Plaintiff Intermountain Fair Housing Council ("IFHC") is an Idaho nonprofit corporation with its principal place of business in Ada County, Idaho. The IFHC's mission is to ensure open and inclusive housing for all people. The IFHC's purpose is to advance equal access to housing for all persons without regard to race, color, sex, religion, national origin, familial status, gender identity, sexual orientation, source of income, or disability[1]. The IFHC attempts to eradicate discrimination through education about the fair housing laws, housing information and referrals, and housing counseling and enforcement, including filing complaints under the Fair Housing Act.

5. Defendant River Run Homeowners Association, Inc. ("the HOA"), is now, and has at all times relevant to this complaint been, an Idaho corporation, with its principal address in Ada County, Idaho. Defendant is a homeowners' association, and is therefore subject to the Fair Housing

---

[1] The term "disability" is synonymous with the term "handicap" as it is used in the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

Act, 42 U.S.C. §§ 3601 *et seq*. The River Run Homeowners Association governs approximately 340 dwellings located within the River Run Subdivision. .

6. At all times relevant to this complaint, Tom Roush, David Holm, Jim Thompson, Jeff Stipp, and Lloyd Cox acted as agents of the HOA.

7. The Pine Lane House and other residences located within the River Run Subdivision are "dwellings" within the meaning of 42 U.S.C. § 3602(b).

### III. Factual Allegations

*A. The HOA's Discriminatory Pool and Tennis Court Rules*

8. The Hills moved to Idaho in August of 2014 and purchased the Pine Lane House.

9. River Run is governed by defendant River Run Homeowners Association. Its current Declaration of Covenants, Conditions, and Restrictions (CC&Rs), which governs residents of River Run, were adopted in 1995 and subsequently amended in 1997.

10. Article XI of the CC&Rs create the Architectural Committee, which has the authority to govern construction, alterations, additions, and landscaping within River Run.

11. According to United States Census data, over 20% of River Run's population is over the age of 65. Only 17% of River Run's population is under the age of 19. River Run is one of the few neighborhoods in Boise that has a higher percentage of people over the age of 65 than people under the age of 19.

12. River Run contains both a swimming pool and tennis courts that may be used by residents, subject to the HOA rules.

13. At all times relevant to this complaint, the swimming pool had a posted sign reading, "Quiet swimming only in pool and Jacuzzi."

14. At all times relevant to this complaint, the tennis courts had a posted sign stating that adults had preference to use the courts after 3:00 pm on weekdays, and at all times on weekends and

holidays. This rule prevents most children from using the tennis courts, because most children are in school during the only time that adults do not have priority—weekdays before 3:00.

### B.   The HOA's Architectural Rules

15. The Pine Lane House has a stream running along the rear boundary of the lot. For the safety of their children, the Hills decided to build a fence around their back yard to prevent one of their children or their nephew from falling into the stream.

16. Architectural improvements in River Run are, and were at all times relevant to the complaint, governed by the Rules and Regulations of the River Run Architectural Committee ("Architectural Rules").

17. As of 2014, Section 3.12 of the Architectural Rules stated, in relevant part, "[F]encing is not encouraged and shall only be allowed under special circumstances and only according to approved plans and specifications approved by the Architectural Committee…. A desire to enclose animals and/or children or to protect property from trespass shall not necessarily be considered a special circumstance."

18. Section 3.12 of the Architectural Rules allowed for four types of fences. One of the allowed fences was "the enclosing fence which, under very special circumstances, may be allowed for the safety of children."

19. Section 3.12 of the Architectural Rules required that an enclosing fence "be of open construction with at least 6 inches between solid elements which themselves may not be more than 4 inches wide (a ratio of 1/3 solid to 2/3 open construction must always be maintained). This fence may not exceed four feet in height, may not enclose more than forty percent (40%) of the rear yard area and may not be situated on a property line, except in limited areas."

20. Section 3.12.2 allowed for wire fences to be constructed along Loggers Creek, another waterway in River Run, "to prevent geese from coming into the yard, or for the safety of small children—if approved by the Architectural Committee."

21. Despite the Architectural Rules' restrictions on fencing, River Run contains a wide variety of fences and fence-like structures, including many that do not conform with the Architectural Rules.

22. Section 11.3 of the Declaration of Covenants, Conditions and Restrictions ("CC&Rs") of the HOA states:

> Decisions of the [Architectural] Committee and the reasons therefor shall be transmitted by the Committee to the applicant at the address set forth in the application for approval, within twenty (20) days after filing all material required by the Committee. Any materials submitted pursuant to this Section shall be deemed approved unless written disapproval by the Committee shall have been transmitted to the applicant within twenty (20) days after the date of filing said materials within the Committee.

### C. The Hills Apply to Construct a Fence that Complies with the Architectural Rules

23. The Hills retained Angela Incelli of Roots Landscaping Design to design a wrought iron fence that would comply with Section 3.12 of the Architectural Rules. Ms. Incelli designed the fence as requested.

24. On October 19, 2014, Brian Hill submitted an application to the River Run Architectural Committee to install the wrought iron fence. The Hills' neighbors were in favor of the application.

25. In a letter accompanying the Hills' application, Brian Hill explained that the purpose of the fence was to protect his children: "My children are very young and are not at the age where they can be around water safely. There is a creek and community swimming pool immediately behind my house. These are a drowning hazard for my children because of their age. My kids are able to fit through the pickets of the fence that surrounds the community pool. In addition to the water hazards, River Run Drive is a busy street and is one house away from my backyard."

26. Brian Hill appeared at a meeting of the HOA on October 20, 2014, where he presented his proposal to install the fence to the full board.

27. On October 20, 2014, Tom Roush, a member of the Architectural Committee, sent an email to the other members of the Committee containing a copy of the Hills' fence application. He wrote, "[The Hills'] proposal complies with River Run Rules and Regs, except for some landscaping aspects. However, by our Rules, the AC may decide whether to allow it, based on circumstances. We can propose changes, or vote to deny it, or vote to approve it."

28. David Holm, another member of the Architectural Committee, responded to Roush's email on October 21, 2014, writing, "The Hill application is deficient under the current fence rules by not including the landscaping element(s) required in the last paragraph of section 3.12…. I propose that Tom return the package to the Hill's [sic] and schedule a site meeting when all elements required are included."

29. The Architectural Committee did not customarily require applicants to submit a complete application to the Committee, as Roush noted in an email to the Committee on October 21, 2014:

> I propose we on the AC treat Brian and his proposal **exactly the same** as we treat other homeowners, and as we would want to be treated. **We have NEVER required a homeowner to submit an acceptable project proposal before we review and vote on it.** I see no reason to single him out by returning his 'incomplete' project proposal and making him change it in a way he and his neighbors don't want. As I wrote to you before, the AC OFTEN receives incomplete project proposals, and I cannot remember a time when we demanded the homeowner re-write them before we would consider it. Instead, either I call the homeowner and get clarifications, and pass them on to the AC, so we can all vote with good information, or we meet with the homeowner and run through whatever concerns we have.

(Emphasis in original.)

30. The Architectural Committee had allowed another homeowner to amend an incomplete project proposal as recently as July 17, 2014. That homeowner did not have minor children.

31. Roush proposed that the Architectural Committee meet on either October 22, 2014, or October 23, 2014, to discuss the Hills' fence proposal. Holm proposed that the meeting be canceled because the application was incomplete.

32. In response to the Hills' application, Holm and other members of the Architectural Committee proposed to eliminate the portion of the Architectural Rules allowing for enclosing fences. In an email of October 30, 2014, Holm wrote that enclosing fences were unnecessary because "…thinking that you remove all risk to your children by fencing them in has been thoroughly rejected by any parents in River Run I have spoken with. Therefore, there is no liability. Anyone buying in River Run understands we have many streams and ponds and they pose a risk to children and the elderly." Holm described the proposed fence as a "corral."

33. On October 23, 2014, Jim Thompson, a member of the Architectural Committee, sent an email to the other members of the Committee, stating:

> Look at the Boise parks. No fences. No fences to keep the geese from wandering, no fences to keep children, Alzheimer's patients, or others from wandering near the water, no dog control fences, no sound abatement fences. If you allow any fences, the homeowner who wants a fence will come up with a "special circumstance" to justify a fence. There is no circumstance that should justify a fence. Home owners are free to move to another location to solve their "special circumstance."

### D. The Architectural Committee Meets and Rejects the Hill's Proposal

34. The Architectural Committee met to discuss the fence at the Hill residence on November 6, 2014.

35. During the meeting, Holm told Brian Hill that Hill was "naïve" to think that he would be allowed to build a fence, asking, "Didn't you see the water hazards when you bought the house?," or words to that effect.

36. During the meeting, a member of the Committee asked Hill, "If we allow your fence, what about other families with young children asking for it?," or words to that effect

37. The Architectural Committee voted to reject the Hills' fence. They did not state a reason for the rejection. The Committee did not assert that the application was incomplete. The Committee did not allege that the fence failed to comply with the Architectural Rules. Individual members of the Architectural Committee told Brian Hill that they opposed the fence because it was "too large," the "wrong color," or it was not "properly screened with landscaping."

38. Shortly after the meeting, Jeff Stipp, a member of the Architectural Committee, spoke to Brian Hill. During their conversation, Stipp stated that he moved to River Run because children did not live nearby. Stipp stated that his wife wanted to work on the patio without hearing noise from children, and that if there were more children in River Run, he would move.

> E. *The Hills' Revised Fence Application is ignored, then denied*

39. On November 10, 2014, Brian Hill contacted IFHC to report his experience and to learn more about his rights under the Fair Housing Act.

40. The Hills submitted a revised application to the Architectural Committee on November 17, 2014. This application added landscaping to help conceal the fence, changed the color of the fence, and reduced the size it would enclose to approximately 950 square feet, including the existing 150 square foot patio. Both of the Hills' neighbors submitted letters endorsing the project.

41. The full HOA Board of Directors met on November 17, 2014. At this meeting, Holm opened discussion of modifying the fence rules, stating that the fence rules had not "kept up with the change in our demographics."

42. At the November 17, 2014 meeting, the Board adopted an amendment to the fencing rules, removing all references to enclosing fences. The amendment also removed the phrase "or for the safety of small children" from the Loggers Creek wire fence rule, and specified that "This fence type shall **NOT** be approved for any other River Run waterway, without exception." (Emphasis in original.)

43. On November 25, 2014, Lloyd Cox, president of the HOA, sent an email to Brian Hill reading, "Your original proposal was rejected by the AC Committee. After reviewing your latest application, which is a slight modification of your original proposal (moving the back fence line in 5'), we feel the revised application is basically an 'Appeal' to proceed with the original plan with minor modifications. Appeals are brought before the RRHOA Board for any further discussion and then the proposal is voted on."

44. Neither the Architectural Rules nor the Architectural Committee Review Process contained any mention of an "appeal" or how to file one.

45. On November 26, 2014, Brian Hill responded to Cox's email, asking to present the modified proposal to the Architectural Committee again: "It was not my intention to have my second proposal be an appeal to the board…. Making an appeal at the next board meeting doesn't allow for iterative changes (if needed) to be made in a time effective manner—the next board meeting is two months away."

46. No representative of the HOA responded to the email of November 26, 2014, within twenty days.

47. On December 19, 2014, attorney Richard L. Stubbs sent a letter to the HOA's attorney, Randall L. Schmitz, stating that because the Architectural Committee did not act on the Hills' application within twenty days of either November 17, 2014 (when the revised application was submitted) or November 26, 2014 (when Brian Hill reiterated his intent to submit the proposal to the Architectural Committee), the application was deemed approved pursuant to Section 11.3 of the CC&Rs.

48. On January 6, 2015, Cox wrote to Brian Hill via certified mail, stating:

Your new application (incomplete) would have been rejected by the Committee on the same basis as the first application.

> Rather than go through a lengthy process of applications and denials, it seemed more fair to you to have the Board hear your proposal as an appeal…. The Board was going to be ruling on it eventually, because even if the AC approved a slightly smaller enclosure, that decision would have been appealed to the Board….
>
> Even though, in my email to you I referred to "your re-submitted application," I was technically incorrect. Since the original application was denied by the AC, a complete new application would be required and that would have to include new neighbor notification forms and new detailed (and accurate) dimensioned drawings of the proposed fence location along with a proposed landscaping plan….
>
> Speaking for the Executive Committee and knowing the attitude of the Board members, I can assure you RRHOA will litigate the matter should you choose to construct the fence as stated by your attorney.

49. On January 15, 2015, Brian Hill met with Holm and Cox to discuss the fence. Holm suggested that instead of allowing the children to play at the Hills' house, the Hills should take their children to Baggley Park, which is located outside of River Run.

50. During this conversation, Holm also told Brian Hill that he wished the enclosing fence category didn't exist, because he did not want people with young children to move into River Run.

51. During this conversation, Holm also told Brian Hill that "this isn't a subdivision in Meridian." Upon information and belief, this statement referred to Meridian's reputation as a family-friendly city.

52. Unable to install a fence to protect their children, and facing hostility against families with children from the HOA, the Hills moved out of the Pine Street House in March of 2015 and sold the Pine Street House on June 18, 2015. Their new house was not in River Run.

*F.  Administrative Complaint*

53. On May 27, 2015, the Hills and IFHC lodged companion complaints with the United States Department of Housing and Urban Development ("HUD"), alleging that the HOA engages in unlawful discrimination. The filing of these complaints tolled the statute of limitations. These complaints were deemed officially filed as of July 16, 2015.

54. HUD closed its investigation against the HOA on September 21, 2017, without issuing a charge. This complaint ensued.

### F. *Injuries*

55. The HOA's actions directly and substantially injured the Hills by causing them to suffer a loss of civil rights and other damages, including lost housing opportunity, emotional distress with attendant physical symptoms, humiliation, and embarrassment. Accordingly, Brian Hill and Anne Hill are entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

56. The HOA's actions directly and substantially injured IFHC by diverting its resources to identify and counteract defendants' unlawful housing practices. Those resources could have been used to provide services, and conduct educational activities, research, and policy advocacy instead of countering the HOA's discriminatory conduct. Accordingly, IFHC is entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

57. The HOA's actions directly and substantially injured IFHC by frustrating its mission of advancing equal housing for all persons without regard to, among other things, familial status.

58. In doing the acts of which plaintiffs complain, defendant acted with reckless disregard of plaintiffs' federally protected fair housing rights. Accordingly, plaintiffs seek to recover punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

59. There now exists an actual controversy between the parties regarding defendant's duties under federal and state laws. Accordingly, plaintiffs are entitled to declaratory relief under 42 U.S.C. § 3613(c)(1), 28 U.S.C. §§ 2201-2202, and Rule 57 of the Federal Rules of Civil Procedure.

60. Unless enjoined, defendants will continue to engage in the unlawful acts and the pattern and the practice of discrimination and unlawful conduct described in the complaint. Plaintiffs have no adequate remedy at law. They are now suffering and will continue to suffer irreparable injury as a result of defendant's acts of discrimination and unlawful conduct unless relief is provided by this

Court. Accordingly, plaintiffs are entitled to injunctive relief under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), and Rule 65 of the Federal Rules of Civil Procedure.

## First Cause of Action

(Fair Housing Act, 42 U.S.C. § 3601 *et seq.*)

61. Plaintiffs repeat and re-allege the foregoing paragraphs of its Complaint as though fully set forth herein.

62. Defendant injured plaintiffs by committing discriminatory housing practices, in violation of the Fair Housing Act., 42 U.S.C. §§ 3604 (a), (b), (c), and 3617.

## Relief Sought

*Wherefore,* Plaintiffs respectfully request that judgment be entered against Defendant as follows:

a. Declaring that defendant's actions violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*;

b. Enjoining defendant to make all necessary modifications to their policies and procedures to comply with the Fair Housing Act;

c. Enjoining defendant to undergo training on the requirements of the Fair Housing Act;

d. Enjoining all unlawful practices alleged in this complaint and imposing affirmative injunctive relief requiring defendant, their partners, agents, employees, assignees, and all persons acting in concert with or participating with them, to take affirmative action to provide equal housing opportunities to all persons regardless of their familial status;

e. Awarding actual and punitive damages to plaintiffs in amounts to be proven at trial;

f. Awarding reasonable attorneys' fees and costs to plaintiffs, pursuant to 42 U.S.C. § 3613; and

g. Awarding such other relief as the Court deems just and proper.

## Jury Demand

Trial by jury is hereby demanded.

*Dated* this 20th day of June, 2018.

/s/

Michael Witry, ISB #7960

Intermountain Fair Housing Council

Attorney for Plaintiffs