UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRIAN HILL, ANNE HILL, and INTERMOUNTAIN FAIR HOUSING COUNCIL, INC.,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>RIVER RUN HOMEOWNERS ASSOCIATION, INC.,<br><br>　　　　　　　　Defendant. | Case No. 1:18-cv-00281-CWD<br><br>**MEMORANDUM DECISION AND ORDER**<br><br>**RE: DKT. 39, 42, 50, and 53** |

## INTRODUCTION

Plaintiffs Brian and Anne Hill, and the Intermountain Fair Housing Council,[1] allege that Defendant River Run Homeowner's Association, Inc., violated the Fair Housing Act's prohibition against discrimination on the basis of familial status. The Hills claim River Run's common area signs and other printed material setting forth the rules for use of the neighborhood pool, tennis courts, and clubhouse, as well as River Run's

---

[1] Plaintiffs will be referred to collectively as the Hills, unless otherwise indicated.

denial of the Hills' application for permission to build a fence, violated 42 U.S.C. §§ 3604(a), (b), (c), and 42 U.S.C. § 3617 of the Fair Housing Act.

Pending before the Court are the parties' motions for summary judgment, and River Run's related motions to strike the affidavit of Brian Hill submitted in support of the Hills' motion, and Brian Hill's declaration submitted in opposition to River Run's motion. The Hills' motion seeks partial summary judgment limited to the issue of liability with regard to the claims asserted under Sections 3604(b) and (c) concerning the River Run signs and printed materials. River Run's motion seeks summary judgment as to all causes of action asserted under the FHA by the Hills and IFHC.

The Court conducted oral argument on the motions on December 10, 2019. After careful consideration of the parties' arguments, the legal authorities cited, and a thorough review of the record, the Court will deny Defendant's motion for summary judgment; grant Plaintiffs' motion for partial summary judgment; and deny Defendant's two motions to strike.

## STANDARD OF REVIEW

### 1.  Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted).  When parties submit cross-motions for summary judgment, "[e]ach motion must be considered

on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

### 2.      Applicable Fair Housing Act Provisions

42 U.S.C. § 3604(a) provides that it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of…familial status…."

42 U.S.C. § 3604(b) prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of…familial status…."

42 U.S.C. § 3604(c) provides that it is unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on…familial status,…or an intention to make any such preference, limitation, or discrimination."

42 U.S.C. § 3617 provides that it "shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

Regulations adopted by the United States Department of Housing and Urban Development (HUD) state that it is "unlawful, because of…familial status,…to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to

deny or limit services or facilities in connection with the sale or rental of a dwelling." 24 C.F.R. § 100.65(a). Prohibited actions include, but are not limited to, "[l]imiting the use of privileges, services or facilities associated with a dwelling because of…familial status,…of an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4).

"Familial status" is defined as "one or more individuals (who have not attained the age of 18 years) being domiciled with ... a parent or another person having legal custody of such individual or individuals." 42 U.S.C. § 3602(k)(1). Familial status discrimination thus entails "discrimination against families with children." *Fair Housing Congress v. Weber*, 993 F.Supp. 1286, 1290 (C.D. Cal. 1997).

## FACTS

In support of their motion for partial summary judgment, the Hills submitted a statement of undisputed facts which River Run did not contest with a separate statement of disputed facts. (Dkt. 42-2.)[2] An independent review of the record establishes the facts as set forth in Docket 42-2 in support of the Hills' motion for summary judgment, and the Court therefore finds the facts undisputed.

In support of its motion, River Run submitted a statement of undisputed facts with numbered paragraphs 1 through 59. (Dkt. 39-2.) The Hills disputed certain statements

---

[2] Although River Run's memorandum filed in opposition to the Hill's motion for partial summary judgment indicated it "dispute[d] the Plaintiffs' statement of facts as set forth herein and as addressed" in its motion to strike the declaration of Brian Hill, River Run did not file a statement of disputed facts, or otherwise dispute the Hills' recitation of the relevant facts for purposes of the Hills' motion. As discussed below, the motion to strike the declaration of Brian Hill will be denied. The Court has, however, considered the arguments and disputed facts raised by River Run in its motion to strike the declaration of Brian Hill.

confined to paragraphs 6, 10, 11, 21, 22, 23, 24, 26, 27, 34, 36, 37, 39, 40-41, 44, 48, 50, and 58 of River Run's statement of facts. (Dkt. 46-1.) An independent review of the record establishes that the facts related to the Hills' application to construct a fence are genuinely disputed.

River Run does not dispute that the Hills' residence constitutes a "covered dwelling" as defined under the Fair Housing Act, or that the Hills meet the definition of familial status in 42 U.S.C. § 3602(k).

The facts material to the Court's determination, and which the Court finds not subject to reasonable dispute, follow.

Intermountain Fair Housing Council ("IFHC") is an Idaho nonprofit corporation operating in the state Idaho. IFHC's stated mission is to advance equal access to housing for all persons and assist with housing complaints. River Run is now, and has been, an Idaho nonprofit corporation since 1980. The officers of River Run Homeowner's Association, Inc. in late 2014 and early 2015 included Lloyd Cox, President; Dave Holm, Vice President; Norm Beckert, Treasurer; and Linda Strauss, Secretary. (Dkt. 40-6 at 2.) Tom Roush served as the Architectural Chair, and Danielle Drake was the Association Manager. *Id*.

The River Run subdivision (the "Subdivision") includes 333 dwellings located within various phases of the Subdivision. The Subdivision is a planned community situated along the Boise River containing multiple creeks and water areas that adjoin the river. Amended CC&Rs were recorded on April 17, 1995. (Dkt. 39-2 at ¶ 3.)

Brian and Anne Hill purchased a residence (the Property) on White Pine Lane, located within the Subdivision, in April of 2013. (Dkt. 39-2 at ¶ 6.) At the time they purchased the Property, the Hills received a copy of the CC&Rs, the 2013 River Run Handbook, and the Architectural Committee Rules and Regulations governing the Subdivision. (Dkt. 39-2 at ¶ 15.) The Hills and their three children, ages 5, 3, and 1, resided on the Property from August of 2014 through March of 2015. (Dkt. 42-2 at ¶ 7.) The Property is a single-family residence located within Phase 2, the White Pine phase, of the Subdivision. The backyard of the Hills' property abuts a small creek with a riparian area and a common area walking path which leads to the community pool.

The 2013 River Run Handbook included the following provisions related to the use of the Subdivision's Recreation Center, which includes the clubhouse, pool, and tennis courts:

**RECREATION CENTER**

The Recreation Center includes the clubhouse, swimming pool, spa, deck, patio area, and tennis courts. Members are residents of River Run with the exception of The Island and Heron Cove (which have their own Phase recreation facilities).

An "Adult" is defined as an individual nineteen (19) years of age or older.

\*\*\*

- The pool, pool deck and spa are closed from the weekend after Labor Day until the weekend before Memorial Day.
- Quiet swimming is required from 9 to 10 p.m.

## CLUBHOUSE

During the summer season when the pool is open, the Recreation Center Manager will unlock the Clubhouse for ADULT USE ONLY. This service will be provided only during the time that the Recreation Center Manager is on the premises. The Clubhouse will remain locked at all other times, except when it has been reserved and checked out to a member.

***

Reservations may be made through the Association Manager during office hours stating the nature of the function and the number of guests expected. Members will be asked to complete a "Clubhouse Rental Agreement" form. The maximum number of guests in the Clubhouse is twenty-five (25). The reservation does not extend to the patio area, swimming pool, spa or tennis courts. A limit of six guests (6) per household at the pool also applies to guests at private parties using the Clubhouse.

## SWIMMING POOL and SPA

No member or guest under the age of 14 may use the pool or spa unless accompanied by an adult (19 or older) member or adult guardian authorized by an adult member.

Guests are limited to six (6) per household. Residents 14 through 18 years of age are limited to one guest per person notwithstanding the household limit. Guests must be accompanied by a member.

****

The Recreation Manager is on duty at times as determined by the Board of Directors. The Recreation Manager has the authority to enforce compliance with regulations and to require members and guests violating rules to leave the premises. The Board will support the good judgment of our Recreation Manager in arriving at the best solution to any problem which may arise.

Decl. of Ertz Ex. 4. (Dkt. 42-3 at 36-37.)

In August of 2014 and for the remainder of the Hills' residency in the Subdivision, signs were posted on the tennis court gate and on the recreation center clubhouse wall, near the pool. (Dkt. 42-2 ¶ 31, 34.) The sign on the tennis court gate was visible to any resident or guest near the tennis court entrance. *Id.* ¶ 32. The tennis court gate sign stated: "Adults have court privileges over children after 3:00 p.m. weekdays and any time on weekends or holidays." *Id.* ¶ 33. The sign on the recreation center clubhouse wall read: "Quiet Swimming Only in Pool & Jacuzzi." *Id.* ¶ 34. The pool sign was visible to residents and guests outside of the pool area, and was visible from the backyard of the Hills' property. *Id.* ¶¶ 35-36.

Brian Hill noticed the sign posted on the fence outside the tennis courts giving preference to adults after 3:00 p.m. He noticed also the pool sign admonishing "quiet swimming only." Mr. Hill took photographs of the tennis court and pool signs on January 22, 2015. Aff. of Hill ¶¶ 8-9, Exs. A, B. (Dkt. 42-4 at 3.) Mr. Hill claims the signs were visible to him and his family, guests, and other residents, and seeing the signs "made us feel like our family would have to be especially careful using the common areas and facilities of the homeowners' association. It felt like we would have to tip toe around with our children since the needs of adults have preference. Seeing these rules contributed to my feeling that my kids and our family were unwelcome in the community." Aff. of Hill ¶ 13. Neither Brian nor Anne Hill recall an instance, however, when they could not use the pool with their children, and they do not recall using the tennis courts, or an instance when their children may have used the tennis courts. (*See* Dkt. 50-1 at 9.)

River Run adopted, posted, and had the power to rescind or alter the rules governing the use of the Recreation Center.

After moving into the Property, Brian Hill applied on October 19, 2014, to construct a fence to enclose their back yard. (Dkt. 40-4 at 2.) The River Run Architectural Committee Rules, effective January 2014 applicable to fencing, stated that the design of the Subdivision was intended to "minimize the need for fencing, especially perimeter fencing." However, the rules allowed perimeter fencing "under special circumstances and only according to approved plans and specifications approved by the Architectural Committee." The stated goal of the fencing rules was to "achieve the appearance of a grouping of homes that have been placed in a park-like setting. To achieve this effect, it is necessary that the lawn area of one neighbor run into the lawn area of another without property boundaries being defined by fencing or landscaping."

The rules allowed four types of fences:

> (1) the privacy fence/screen, (2) the enclosing fence which, under very special circumstances, may be allowed for the safety of children, and (3) the sound abatement fence which shall be approved for the homes immediately abutting Park Center Blvd, specifically lots 13-17 of Block 3, and lots 5,6,7,8 of Block 1, Phase 1A; and 4) only for houses where the back yard is along Loggers Creek, short wire fences may be installed if approved by the Architectural Committee. Fences must be constructed and installed in accordance with para 3.12.2.

Architectural Rules § 3.12 Fencing. (Dkt. 49-2 at 41.)[3]

---

[3] There is no dispute that the Architectural Rules allowed enclosing fences at the time Brian and Anne Hill purchased the property in April of 2013. The provision allowing short wire fences along Logger's Creek was added in January of 2014.

With regard to enclosing fences, the Architectural Rules specified that the fence "must be of open construction with at least 6 inches between solid elements which themselves may not be more than 4 inches wide (a ratio of 1/3 solid to 2/3 open construction must always be maintained). This fence may not exceed four feet in height, may not enclose more than forty percent (40%) of the rear yard area and may not be situated on a property line, except in limited areas." (Dkt. 49-2 at 41-42.)

The Rules required submission of an application form, two neighbor notification forms, a description of the height, location, color and design of the fence, a site plan, a sample of the proposed building materials, a paint or stain chip, and any other information requested. (Dkt. 40-3 at 12.) The Rules required also that enclosing fences be screened on the neighbor's side of the fence with groupings of landscaping materials placed on the applicant's property. (Dkt. 40-3 at 13.) And last, the Rules indicated that the homeowner could expect a determination by the committee within twenty calendar days after submission of the application. (Dkt. 40-3 at 7.)

The Hills' application was submitted on the proper form, and contained a letter describing the proposed project; a photograph depicting the proposed height, color, design, and building materials; and a drawing depicting the location of the proposed fence. (Dkt. 49-5.) Brian Hill explained the purpose of the fence was for the safety of his young children, due to the waterway that bordered the rear yard of the Property. (Dkt. 49-1 at 37.) The minutes of the River Run HOA meeting conducted on October 20, 2014,[4]

---

[4] The minutes indicate that the River Run HOA held a regular meeting, and a quorum was present. Mr. Hill was present also.

reflect that Tom Roush, Architectural Committee Chair, presented the Hills' fence application. (Dkt. 40-6 at 3.) Another topic on the agenda was the consideration of amendments to Section 3.12 of the Architectural Rules governing fencing, during which River Run discussed the "type, color and plantings around the Enclosing Fences." (Dkt. 40-6 at 4.)

Emails prior to the October 20 meeting indicated that the proposed fence rule changes under consideration would "specifically prohibit wrought iron as a fencing material. The same effect and containment can be achieved with wood." (Dkt. 49-1.) Another email to the members of the River Run Architectural Committee from Tom Roush indicated that Brian Hill's proposal "complies with River Run Rules and Regs, except for some landscaping aspects. However by our Rules, the AC may decide whether to allow it, based on circumstances." (Dkt. 49-1 at 3.)

Emails circulated among the Architectural Committee members and River Run board members after the October 20 meeting indicate that River Run considered rejecting the Hills' application for noncompliance with planting regulations. (Dkt. 49-1 at 4, 5.) Tom Roush proposed, however, that the Architectural Committee treat the proposal the same as others, because the Committee has "NEVER required a homeowner to submit an acceptable project proposal before we review and vote on it. I see no reason to single him out by returning his 'incomplete' project proposal and making him change it in a way he and his neighbors don't want." (Dkt. 49-1 at 4.)

On October 23, 2014, Linda Strauss emailed members of the Architectural Committee indicating that the problem with the current fencing rules was the provision

for the "enclosed Fence….I would hate to see small fences popping up everywhere….
Enclosed Fences do not go along with the 'park like setting' that the homeowners of
River Run bought into when they purchased their homes here….Changing the rules and
reg to comply to one family (or even more) does not do that. I understand the []
demographics of the neighborhood are changing, but what about those homeowners that
bought into the idea of a 'parklike setting' a long time ago." (Dkt. 49-1 at 13-14.)

Another email, drafted by Tom Roush on October 23, 2014, indicated there was
"no Board intention or direction to change the rules about enclosing fences until Dave
[Holm] decided he wanted to do it….A decision [on the Hill Application] should NOT be
based on rules adopted *as a result* of his project proposal." (Dkt. 49-1 at 16.) On October
24, 2014, Linda Strauss wrote again to restate that, "as the demographics change, if this
clause [regarding enclosing fences] is left in the rules and regs, I believe we will see
many more requests for such fences, which will have a real impact on our 'park-like
setting' and I believe will impact property values." (Dkt. 49-1 at 22.)

An email dated October 28, 2014,authored by David Holm and addressed to Lloyd
Cox, Danielle Drake, Norm Beckert, and Linda Strauss, indicated that he had "been
trying to come up with a way to appeal a yes vote on Hill and the only way I can come up
with is to personally appeal it based on the requirement that landscaping materials shall
be part of the project…It is not a strong position…but unless the Executive Board would,
as a group, appeal based on the timing of the application conflicting with a re-write…that
might make a stronger case." (Dkt. 49-1 at 29.) David Holm later wrote that it would be

"much cleaner if Hill would see the handwriting on the wall and withdraw his proposal until the new language is adopted," to eliminate enclosing fences. (Dkt. 49-1 at 30.)

On October 29, Tom Roush wrote to the members of the Architectural Committee that there were "fences ALL OVER the place on White Pine Lane," complaining that the Architectural Committee had treated the Hills' fence application "entirely differently than other homeowners' applications." (Dkt. 49-1 at 32.) Roush also noted that the Architectural Committee had approved "other such fences over the years; there are at least three [enclosing fences] in place now…to an outside observer there would seem to be fences of *all kinds* on White Pine Lane," and that, all of a sudden, a rule that has been in place "for, what, twenty years?...without any objections or heartburn? And all of a sudden, now that Brian [Hill] has submitted his application, we eliminate that kind of fence?" (Dkt. 49-1 at 32-33; *see also* Dkt. 49-1 at 37, acknowledging original intent of the modifications to the fencing rules proposed in October 2014 was not to eliminate an option for an enclosing fence, but "as a result of" the Hills' application, the Board was considering eliminating the option for the enclosing fence entirely.").

The Architectural Committee met on November 6, 2014, in the Hills' back yard to vote on the fence application. (Dkt. 49-2 at 1.) The application was denied with a vote of 6 to 1. (Dkt. 49-2 at 1.) The Committee did not give the Hills "specific direction" with regard to what it might approve. (Dkt. 49-2 at 2, 9.) Tom Roush thereafter resigned as the Chair of the Architectural Committee. (Dkt. 49-2 at 21.) Roush expressed his opinion that the re-write of the rules eliminated the "long-standing fence rules (since 1988…) so that neither Brian [Hill] nor anyone else with children would ever be able to build a fence for

their children's safety. This is despite the fact that such fences had been permitted over the years for other residents…." (email, Feb. 11, 2015, Dkt. 49-2 at 21.)

On November 17, 2014, the Hills resubmitted their fence application with the original submissions; a color swatch; a second letter and two letters from the adjacent neighbors, both of whom supported the application, with one expressly requesting that the fence remain open and without landscaping; and proposed the following changes: the installation of bushes along the waterway near the pool (the back of the fence); and reduction of the depth of the fence by five feet. (Dkt. 49-6.)

On November 17, 2014, River Run adopted new Fence Rules and Regulations, eliminating the enclosing fence as an option but leaving in the Privacy Screen option. (Dkt. 49-2 at 8; 49-3 at 32.) The Architectural Committee discussion, as recorded in the minutes, indicated that the "fencing requirements have not kept up with the change in our demographics." (Dkt. 49-3 at 36.)

David Holm on November 19 proposed that the Executive Board reject the Hills second application, because the Architectural Committee had "no interest in discussing a modification to allow a play area…." (Dkt. 49-2 at 3.) The Executive Board elected to treat the Hills' second application as an "Appeal to proceed with the original plan with minor modifications," and it notified Brian Hill that the appeal would be brought before the River Run Homeowner's Association Board for further discussion and a vote. (49-2 at 3-4.) On November 25, 2014, Lloyd Cox informed Brian Hill that his second application would be considered an appeal under the prior fencing rules, or he could "submit a new application under the new rules that reflects the revised Privacy Screen definition and

allowed characteristics." (Dkt. 49-2 at 8.) Brian Hill objected to the characterization of his second application as an appeal, and requested a vote on the second application by the Architectural Committee under the prior enclosing fence guidelines. (Dkt. 49-2 at 9; *see also* Dkt. 49-2 at 10, "We [the Committee] told him we would review his request under the old rules, but that is about to change…Maybe if he would get real and submit something that the AC could/would approve we could move on.").

The Hills' attorney on December 19, 2014, notified River Run it was in violation of its CC&Rs by failing to vote on the second application within twenty days; therefore, the second application was deemed approved, and the Hills would be proceeding with construction of the fence. (Dkt. 40-13.)

On January 6, 2015, Lloyd Cox wrote to Brian Hill notifying him there was "no willingness to consider an alternate enclosing fence," and inviting him to appeal the AC denial of his original application at the January 19, 2015 Board meeting. (Dkt. 49-19 at 1.) Mr. Cox stated also that, "Speaking for the Executive Committee and knowing the attitude of the Board Members, I can assure you RRHOA will litigate the matter should you choose to construct the fence…." (Dkt. 49-19 at 2.)

River Run's Board of Directors met on January 19, 2015, to consider Brian Hill's appeal of his fence application. (Dkt. 49-4 at 1.) Brian Hill did not attend the meeting. *Id.* River Run did not vote on the appeal. Rather, a motion was made and seconded to "engage Givens Pursley to review our documentation…." (Dkt. 49-4 at 3.)

River Run produced a photograph during discovery depicting a wrought iron enclosing fence similar to that proposed by the Hills. (Dkt. 49-7.)[5] An application to construct a fence along Loggers Creek to prevent geese from coming into the yard resulted in a re-write of the rules, which were approved January of 2014, to allow wire fences for all residents along Loggers Creek. (Dkt. 49-2 at 19, 22; 49-2 at 33; 49-3 at 24.) Mike M. submitted a proposal to the Architectural Committee on or about August of 2014, to enclose his back yard by connecting a rear fence to the two existing side fences, which proposal was approved on August 18, 2014. (Dkt. 49-3 at 2.) Brian Hill's affidavit submitted in opposition to River Run's motion included fifty-two photographs of fences in the White Pine phase and other phases in the Subdivision. (Dkt. 48-2.) Lloyd Cox recalled one other instance where the AC Committee approved an enclosing fence for a special needs child prior to the adoption of the new rules eliminating enclosing fences. (Dkt. 49-20 at 11.)

After the change to the Architectural Committee Rules in November of 2014 to eliminate enclosing fences, the Architectural Committee, on June 15, 2015, indicated that a fence application submitted by Marv and Frances W. seeking to build a fence at the back of their property connecting two existing side fences would be "approved," even though the rules "regarding fences does [sic] not allow for this type of fence." (Dkt. 49-2 at 27.) In or about September of 2017, the Architectural Committee allowed an enclosing fence for 1981 Springbrook Lane projecting into a rear yard for the safety of a "special

---

[5] The location, timing of construction, or any other details regarding the construction of this fence are not clear from the record.

needs" individual, who was 22 years old and came home on the weekends. (Dkt. 49-20 at 11; 49-9 at 10.) The purpose of the fence was to "ensure his safety." (Dkt. 49-9 at 10.)

In November of 2014, the Hills engaged IFHC to assist them. Aff. of Olsen ¶6. (Dkt. 42-5 at 2.) On May 27, 2015, the Hills, on behalf of themselves and their three minor children, filed an administrative complaint with HUD alleging River Run violated 42 U.S.C. §§ 3604(a), (b), and (c). IFHC acted as the Hills' representative before HUD, and for the duration of the HUD investigation of the Hills' administrative complaint. IFHC worked also to remedy familial status discrimination occurring at the Subdivision. *Id.*

The HUD complaint filed on May 27, 2015, alleged that River Run issued discriminatory statements and had adopted discriminatory terms and conditions based upon familial status. (Dkt. 51-4 at 1.) The HUD complaint included an allegation that "River Run also has overly restrictive rules on children. At the tennis courts, it is posted that adults have preference over children after 3:00 p.m. on weekdays, and at all times on weekends and holidays." (Dkt. 51-4 at 4.) The complaint alleged also that the Hills were not allowed to construct a fence due to discrimination based on familial status.

The HUD complaint was amended on July 15, 2015. (Dkt. 51-5.) The amended HUD complaint alleged that River Run had "overly restrictive rules on children. On or about August 5, 2014, Complainants noticed at the tennis courts, it is posted that adults have preference over children after 3:00 p.m. on weekdays and at all times on weekends and holidays. A posting at the pool says, 'Quiet swimming only in pool and Jacuzzi.'" (Dkt. 51-5 at 2.) The allegations included also the Hills' assertion that River Run denied

their application to construct a fence based upon their belief that they were subject to discrimination based upon familial status. (Dkt. 51-5 at 2.)

River Run removed and replaced the tennis court and pool signs in February of 2015. In March of 2015, River Run voted to revise the 2013 River Run Handbook and Pool Rules. Aff. of Jones ¶ 2, Ex. A. (Dkt. 51-1.) The River Run Handbook was amended and published in or about July of 2015, eliminating the restrictions placed upon children's use of the Recreation Center. Aff. of Jones ¶ 3 Ex. B. (Dkt. 51-1.)

The Hills timely filed this lawsuit.

## ANALYSIS

1. **The Hills' Motion for Partial Summary Judgment and River Run's Related Motion to Strike**

   A. *River Run's Motion to Strike – Docket 50*

   In support of their motion for partial summary judgment, the Hills submitted the Affidavit of Brian Hill. (Dkt. 42-4.) The affidavit describes the tennis court, pool, and clubhouse signs, and attaches two photographs of the tennis court and pool signs that Brian Hill took on January 22, 2015. He explains the rules contributed to his feeling that his children and his family were unwelcome in the community. River Run requests the Court enter an order striking the affidavit entirely, and deny Plaintiffs' motion for partial summary judgment as a discovery sanction, on the grounds that: (1) the Hills failed to disclose the photographs during discovery; and, (2) Brian Hill's prior deposition testimony contradicts his affidavit.

River Run claims Plaintiffs' motion for partial summary judgment should be denied pursuant to Fed. R. Civ. P. 37(c)(1) as a discovery sanction, because the Hills failed to disclose or produce the two photographs during discovery. River Run relies also upon Fed. R. Civ. P. 56(c)(2), which allows objections to material cited to support or dispute a fact if it cannot be presented in a form that would be admissible in evidence. The Court finds River Run's arguments lack merit. First, River Run does not dispute the language or existence of the tennis court and pool signs, as depicted in the photographs. Both the initial and amended HUD complaint contained allegations regarding the signs. The Complaint filed in this matter quoted the signs' language. And, River Run admitted removing the signs in February of 2015. The Court finds the failure to disclose the photographs harmless pursuant to Fed. R. Civ. P. 37(c)(1).

Next, River Run argues summary judgment should be denied as a sanction because the Hills' deposition testimony regarding emotional distress damages contradicts Mr. Hill's affidavit, and the Hills did not disclose information supporting their claim for emotional distress damages during discovery. River Run argues it is prejudiced, because it was not aware of the Hills' claim for emotional distress damages and therefore did not inquire about the same during discovery. The Court finds River Run misunderstands the Hills' claim and misrepresents the evidence in the record regarding the Hills' claims for emotional distress.

The Complaint alleges the rules and signs published by River Run are facially discriminatory. When a claim involves facial discrimination under the Fair Housing Act, injury is *presumed* once a violation is established. *Silver Sage Partners, Ltd. v. City of*

*Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("Where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation."). Even if some showing was required, it is not onerous. Such injury may include humiliation, embarrassment, and emotional distress. *Green v. Rancho Santa Margarita Mortgage Co.*, 28 Cal.App.4th 686, 699, 33 Cal.Rptr.2d 706 (1994). It could also include "inconvenience" and "loss of enjoyment of life." *U.S. v. Burke*, 504 U.S. 229, 241 (1992).

River Run relies upon deposition testimony wherein Brian Hill and Anne Hill were asked about their pool and tennis court use. River Run asserts the Hills did not suffer damages, because they testified that they were not prevented from using the pool with their children, and they did not recall using the tennis courts, while they resided in the Subdivision. However, that testimony does not preclude damages for the injury presumed under *Silver Sage Partners* when facial discrimination is claimed, as it is here.

The record also reflects that River Run had prior knowledge of the nature of the Hills' emotional distress damages. The HUD report of investigation reflects the Hills referenced feeling uncomfortable and unwanted in the neighborhood, especially when at the pool with their children. (Dkt. 57-1 at 14.) Brian Hill asserts the same in his affidavit. (Dkt. 42-2 at 4 ¶ 13.) The Complaint in this matter sets forth a claim for emotional distress damages, and the Hills' initial disclosures indicate they are seeking emotional distress damages. (Dkt. 50-3 at 3.) Thus, Brian Hill's affidavit is not the first time River Run was on notice of the Hill's claim for emotional distress damages related to the signs at the pool and tennis courts.

Despite prior knowledge of the Hills' claim for emotional distress, the record reflects River Run did not ask either Brian Hill or Anne Hill during their depositions about their emotional distress upon viewing the signs at the pool or tennis courts, or upon reading the Recreation Center rules in the 2013 River Run Handbook. Instead, the questions posed during the Hills' depositions focused solely upon whether the Hills and their children were ever denied access to the tennis court, pool, and clubhouse. However, as explained above, proof of denial of access is not required in connection with a claim of facial discrimination.

The Court will deny the Motion to Strike.

**B.**    ***The Hills' Motion for Partial Summary Judgment – Docket 42***

The Hills move for partial summary judgment with respect to liability on their FHA claims asserted under 42 U.S.C. § 3604(b) and (c) related to the signs and printed materials governing the use of the Recreation Center.[6] The Hills assert the tennis court signs and clubhouse rules targeting children and families with children were facially discriminatory.[7]

River Run argues The Hills have not set forth sufficient admissible evidence to support their motion for summary judgment. River Run contends: (1) The Hills lack

---

[6] The Recreation Center encompasses the tennis courts, pool, and clubhouse.

[7] Although Brian Hill's affidavit includes also allegations related to the "quiet swimming only" sign at the pool, Plaintiffs' motion for partial summary judgment addresses only the tennis court sign and not the pool sign. River Run admitted it removed and changed the language of both the tennis court and pool signs in February of 2015.

standing;[8] (2) the rules were not discriminatory and were implemented for a legitimate

business purpose; (3) Section 3604(c) does not apply because the publication of the rules

did not relate to the rental or sale of a dwelling; and (4) even if the rules were

discriminatory, such does not equate to a finding of liability under the FHA or entitle the

Hills to recover damages.

**(1)**     ***Standing Under the Fair Housing Act***

(a)     *Brian and Anne Hill*

Contrary to River Run's argument, the Hills have standing. The United States

Supreme Court has long held that claims brought under the FHA are to be judged under a

very liberal standing requirement. The sole requirement for standing under the FHA is the

"Article III minima of injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363,

372 (1982). To meet this requirement, a plaintiff need only allege "that as a result of the

defendant's [discriminatory conduct] he has suffered a distinct and palpable injury." *Id.*

Under the FHA, any person harmed by discrimination, whether or not the target of

the discrimination, can sue to recover for his or her own injury. *Harris v. Itzhaki*, 183

F.3d 1043, 1050 (9th Cir. 1999) (citing *Trafficante v. Metropolitan Life Ins. Co.*, 409

U.S. 205, 212 (1972)). "This is true, for example, even where no housing has actually

been denied to persons protected under the Act." *San Pedro Hotel, Inc. v. City of Los

Angeles*, 159 F.3d 470, 475–76 (9th Cir. 1998) (upholding standing of hotel owners in

suit alleging that the City interfered with the housing rights of the mentally ill); *Smith v.*

---

[8] In Section III (2) of its motion for summary judgment, River Run argues also that Plaintiffs lack
standing.

*Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975) (real estate agent fired for renting apartments to minorities allowed to sue under the Act)).

River Run argues that the Hills allege a "stigmatic injury," and must therefore show discriminatory treatment together with substantial emotional injury. River Run argues the Hills have not met their burden upon summary judgment to establish an actionable injury sufficient to confer standing, because the Hills and their children were never denied access to the Recreation Center, and suffered mere discomfort. River Run, however, conflates the Hills' claims. As discussed above, injury is presumed once a violation is established. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("Where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation."). Even if some showing is required, it is not onerous. Such injury may include humiliation, embarrassment, and emotional distress. *Iniestra v. Cliff Warren Investments, Inc.*, 886 F. Supp. 2d 1161, 1167 (C.D. Cal. 2012). It could also include "inconvenience" and "loss of enjoyment of life." *U.S. v. Burke*, 504 U.S. 229, 241 (1992).

Here, the Hills have produced evidence establishing emotional distress injury sufficient to meet their prima facie burden. Mr. Hill set forth in his declaration that he and his family experienced emotional distress upon viewing the signs and printed materials. Therefore, the Hills have adequately met their burden to establish they are "aggrieved persons" entitled to maintain an action under the FHA. Whether the Hills' injury is ultimately an appropriate basis for anything more than a nominal damages award by the jury is not an issue currently before the Court. *See, e.g., Blomgren v. Ogle*, 850 F.Supp.

1427, 1440–41 (E.D. Wash. 1993) (granting partial summary judgment on section 3604(c) claim, but noting damages must be proven at trial).

    (b)    *The IFHC*

River Run also argues IFHC suffered no damages, because the tennis court sign was removed, and the Recreation Center rules changed, prior to IFHC becoming actively involved in the case. However, the record reflects that IFHC assisted the Hills beginning in or about November of 2014, and investigated, educated, pursued outreach regarding familial status discrimination, filed the complaint with HUD in May of 2015 on behalf of the Hills, provided legal resources and assistance to the Hills, and worked to remedy familial status discrimination occurring at River Run. (Aff. of Olsen, Dkt. 42-5 at 3.) The May 2015 HUD complaint, expressly mentioned the overly restrictive rules, and quoted the tennis court sign as an example. The July 2015 amended HUD complaint included also a quote of the rule requiring quiet swimming.

Diverted staff time of an organizational plaintiff such as the IFHC has been recognized as a compensable injury. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1166 (9th Cir. 2013) (citing *Walker v. City of Lakewood*, 272 F.3d 1114, 1124–25 (9th Cir. 2001); *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785–86 (9th Cir. 1982); and *cf. Fair Housing of Marin v. Combs*, 285 F.3d 899, 903–04 (9th Cir. 2002) (holding that an organizational plaintiff suffered injury sufficient to confer Article III standing where it diverted staff resources to combating FHA violations)).

River Run did not remove the tennis court (and pool) sign until February of 2015, after IFHC had begun assisting the Hills. And it was not until March of 2015 that River

Run voted to revise its 2013 River Run Handbook and Pool Rules. The final published

handbook eliminating the restrictions placed upon children's use of the Recreation Center

was not printed and published until July of 2015. Based upon the evidence in the record,

the Court finds IFHC has adequately substantiated its allegations that it suffered an actual

and palpable injury to confer standing to bring this action.

### (2) *The Hills' Section 3604(b) Claim*

The Hills argue that the tennis court sign, adult only clubhouse rule, and pool

guest rule are facially discriminatory and were not implemented for a legitimate business

purpose.

Section 3604(b) of the FHA prohibits discrimination "against any person in the

terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of

services or facilities in connection therewith, because of…familial status…." A plaintiff

may bring a Section 3604(b) claim by alleging disparate treatment or disparate impact.

*Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008). The Hills claim

disparate treatment. A plaintiff may establish a prima facie violation of section 3604(b)

by establishing the existence of "facially discriminatory rules which treat children, and

thus, families with children, differently and less favorably than adults-only households."

*U.S. v. Plaza Mobile Estates*, 273 F.Supp.2d 1084, 1091 (C.D. Cal. 2003). Section

3604(b) reaches post-acquisition discrimination, because the inclusion of the word

"privileges" in the statute implicates continuing rights, "such as the privilege of quiet

enjoyment of the dwelling." *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009).[9]

The three-part test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is used to evaluate claims of discrimination brought under Section 3604(b) of the FHA. *U.S. v. Badgett*, 976 F.2d 1176, 1178 (8th Cir. 1992). The plaintiff must first prove a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate non-discriminatory reason for its action.

"Once a prima facie case is established, defendants must articulate a legitimate, non-discriminatory justification for the challenged policy." *Fair Hous. Council of Orange Cty., Inc. v. Ayres*, 855 F. Supp. 315, 318 (C.D. Cal. 1994) (citing *Badgett*, 976 F.2d at 1178); *see also Pfaff v. U.S. Dep't of Hous. & Urban Dev*., 88 F.3d 739 (9th Cir. 1996); *Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1243 (E.D. Cal. 2009). "To accomplish this, the defendant is only required to set forth a legally sufficient explanation." *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

If the defendant satisfies this burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons asserted by the defendant are pretextual. *Intermountain Fair Hous. Council v. Orchards at Fairview Condo. Ass'n, Inc.*, No. 1:09-

---

[9] In its briefing, River Run argued that Section 3604 did not reach post-acquisition conduct. However, at the hearing, River Run conceded that binding authority, including *City of Modesto*, holds that section 3604 reaches post-acquisition conduct.

CV-522-CWD, 2011 WL 162401, at *9 (D. Idaho Jan. 18, 2011) (citing *Pollitt v. Bramel*, 669 F.Supp. 172, 175 (S.D. Ohio 1987)).

a) *Tennis Court Sign*

The tennis court sign stated: "Adults have court privileges over children after 3:00 p.m. weekdays and any time on weekends or holidays." The uncontroverted facts establish that the sign was visible to any resident or guest, including the Hills, and adorned the gate to the tennis courts at all times the Hills resided at the Property. The rule on its face describes a preference given to adults. At the hearing, River Run conceded the rule stated a clear preference for adults and could not articulate, or point to evidence in the record of, a legitimate, non-discriminatory reason for implementation of the rule.[10]

b) *Clubhouse Rule*

The River Run Handbook provided that the clubhouse was reserved for "ADULT USE ONLY" during the summer months, while the pool was open. The clubhouse's use was for "private parties," which included parties such as birthday parties, and meetings or gatherings. The rule on its face constitutes an outright prohibition on children's use of common area facilities. *See Fair Housing Congress v. Weber*, 993 F.Supp. 1286, 1292-1293 (C.D. Cal. 1997) ("outright prohibitions on children's use of facilities like a billiards room and shuffleboard facility were not justified, and that rules requiring adult

---

[10] River Run argued that the rule was somehow saved because it stated a preference, rather than an outright ban, on the use of the tennis courts by children during certain times. However, when pressed at the hearing to distinguish the tennis court rule preferring adults after 3:00 p.m. from a rule that stated a preference for "whites only after 3:00 p.m.," River Run could not articulate a distinction. The Court finds none. Further, River Run conceded that, on the record before the Court, there was no evidence of a legitimate purpose for the rule.

supervision of all children (up to age 18) at all times were not justified."). Consistent with the authorities discussed in *Orchards at Fairview Condo. Ass'n, Inc.*, 2011 WL 162401 at *10, the Court finds rule is facially discriminatory because it is expressly premised upon familial status, and imposes different terms upon, and limits services to, families with children.

River Run argues that the clubhouse has no amenities, but is simply a small room used for meetings, implying it was not attractive for use by children. (Dkt. 51-6 at 2.) And, River Run indicated that, "out of concerns for damage and vandalism," River Run required an adult to reserve the room. *Id.* Ms. Drake, the Association Manager, also stated that no one ever actually excluded children from the clubhouse, and the rule was simply meant to require adult supervision.

Similar arguments used to justify "adults only" rules, or "adult supervision" rules, have been found by other courts to be illegitimate justifications for such rules. For instance, in *Plaza Mobile Estates*, the court granted partial summary judgment for the plaintiffs because a rule prohibiting children walking around the mobile home park without adult supervision was an overbroad attempt to ensure the safety of children. *United States v. Plaza Mobile Estates*, 273 F.Supp.2d 1084, 1091 (C.D. Cal. 2003). In *Fair Housing Congress*, the court granted partial summary judgment for plaintiff because an apartment rule which stated that, "[c]hildren will not be allowed to play or run around inside the building area at any time because of disturbance to other tenants or damage to building property" was overbroad. *Fair Housing Congress v. Weber*, 993 F.Supp. 1286, 1289 (C.D. Cal. 1997); *see also Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1244

(E.D. Cal. 2009) (granting partial summary judgment for plaintiff because rule requiring children "10 and under to be supervised by an adult" violated § 3604(b)); *Llanos v. Estate of Coehlo*, 24 F.Supp.2d 1052, 1061–1062 (E.D. Cal. 1998) (defendant's rule restricting children under 18 from using adult pools was "overly broad, 'paternalistic' and unduly restrictive"); *Landesman v. Keys Condo. Owners Ass'n*, 2004 WL 2370638, at *4 (N.D. Cal. 2004) ("The desire for peace and quiet—while a worthy goal—is not a valid justification for denying access to common facilities on the basis of familial status"); *Iniestra v. Cliff Warren Investments, Inc.*, 886 F. Supp. 2d 1161, 1168 (C.D. Cal. 2012) (finding safety and noise justifications uncompelling justifications for rule prohibiting use of pool by children without an adult).

Here, the rule on its face does not purport to allow use of the clubhouse by children, even with an adult. The rule expressly states the clubhouse is for adult use only. Thus, River Run's ad hoc justification, that it was meant to require a reservation by an adult, is belied by the express language of the rule itself. And, to state that a meeting room is simply "not attractive" for children's use is a nonstarter to justify a ban on its use by children. Children could presumably use the table to eat lunch, play cards, play board games, take a break from the sun, read a book, or any number of other activities while using the pool. The Court therefore finds River Run's justification for the adults only clubhouse rule to be meritless.

c) *Pool Guest Rule*

The handbook expressly stated that, while adults were permitted to have up to six guests per household, "residents 14 through 18 years of age" were limited to one guest

per person "notwithstanding the household limit." The rule unambiguously targets children of a certain age group and treats families with children differently than other households. It is therefore facially discriminatory under the authorities discussed above.

River Run argues its pool guest rule applicable to children ages fourteen to eighteen was meant to address concerns of overcrowding, "vandalism, drug use, sexual assault, etc." (Dkt. 51 at 17.) For instance, Ms. Drake stated in her affidavit that the purpose of the rule was to set a limit on the number of guests unsupervised teens could have at the pool, "out of concern that this area would be taken over by one or two young residents and their non-resident friends---and thus be unavailable for other members." (Dkt. 51-6 at 2.) She stated also that the limit on unaccompanied non-resident teens served "to address concerns of damage and vandalism that may be caused by large groups of unsupervised teens." *Id.*[11]

The Court finds, however, that River Run's concerns are not tied to the proffered reasons. Adults can also overcrowd and vandalize the pool and surrounding area, yet adults were allowed up to six guests. River Run offers no justification why teenagers with six guests are more problematic than adults with six guests, who would also "take over" the pool to the exclusion of other residents by bringing more guests. Prohibiting certain children from bringing more than one guest to the pool while allowing adults to do so cannot be justified. *See United States v. Plaza Mobile Estates*, 273 F. Supp. 2d 1084,

---

[11] River Run, in footnote 5 of its brief, argues that the sign requiring "quiet swimming" was not discriminatory because it applied to everyone. The Court declines to address the sign for purposes of the Plaintiffs' motion for partial summary judgment, because the issue was not raised in the motion.

1092 (C.D. Cal. 2003) (finding prohibition against all children from playing in common areas while allowing individuals eighteen and older to do so cannot be justified). And, the rule is not age-neutral.[12]

"The statute does not distinguish among any of the protected characteristics, in the sense of indicating that some are more worthy of protection than others. Thus, there is no exception to the scope of protection, such that discriminatory treatment based on familial status would be acceptable under the FHA if there is a showing that adult residents of a housing complex do not like sharing a swimming pool with children." *Landesman v. Keys Condo. Owners Ass'n*, No. C 04-2685 PJH, 2004 WL 2370638, at *4 (N.D. Cal. Oct. 19, 2004), *aff'd*, 125 F. App'x 146 (9th Cir. 2005). The rule was expressly directed at children, specifically teenagers, and the Court finds River Run's proffered purpose is not legitimate.

The Court therefore finds that River Run has not raised a genuine issue of material fact as to a legitimate, non-discriminatory reason for its tennis court, clubhouse, and pool guest rules. The Court therefore needs not address pretext.

### (3)  *The Hills' Claim Under 3604(c)*

River Run argues the Hills cannot maintain a claim under Section 3604(c), because the Recreation Center rules and tennis court sign do not relate to the sale or

---

[12] For instance, certain age-neutral rules limiting the number of guests have been justified. *See Landesman v. Keys Condo. Owners Ass'n*, No. C 04-2685 PJH, 2004 WL 2370638, at *4 n.4 (N.D. Cal. Oct. 19, 2004), *aff'd*, 125 F. App'x 146 (9th Cir. 2005) ("This is not to say that The Keys Association cannot impose other reasonable, age-neutral restrictions on the use of one or more of the pools.").

rental of a dwelling. River Run asserts actionable publications are limited to those

provided to the Hills prior to their purchase of the Property. River Run argues the Hills

have not presented sufficient evidence to establish that the rules and signage related to the

sale or rental of a dwelling, because the rules were provided to the Hills after they

purchased the Property. *See Morris v. W. Hayden Est. First Addition Homeowners Ass'n,*

*Inc.*, No. 2:17-CV-00018-BLW, 2017 WL 3666286, at *3 (D. Idaho Aug. 24, 2017)

(denying motion to dismiss and finding letter sent by HOA prior to plaintiffs' purchase of

home related to the sale or rental of a dwelling).

Section 3604(c) does not require discriminatory intent and is not analyzed under a

burden-shifting paradigm. Rather, the inquiry under this section of the FHA is whether

the statement at issue suggests a preference to an "ordinary reader or listener." *Fair*

*Housing Congress v. Weber*, 993 F.Supp. 1286, 1290 (C.D. Cal. 1997); *Llanos v. Estate*

*of Coehlo*, 24 F.Supp.2d 1052, 1057 (E.D. Cal. 1998) (noting that the Ninth Circuit has

not addressed the issue but adopting the "sound" reasoning of other circuits). Proof of

discriminatory intent is not required. *Llanos*, 24 F.Supp.2d at 1056. Discriminatory

preference, rather than an outright ban, is the basis for a Section 3604(c) violation.

*Weber*, 993 F.Supp. at 1291; *Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1245

(E.D. Cal. 2009). The Court finds the tennis court sign and Recreation Center rules meet

this test.

HUD regulations make clear that Section 3604(c)'s prohibitions apply to

"[w]ritten notices and statements includ[ing] any application, flyers, brochures, deeds,

signs, banners, posters, billboards or any documents used with respect to the sale or rental

of a dwelling." 24 C.F.R. § 100.75(b). The prohibition applies "to all written or oral statements by a person engaged in the sale or rental of a dwelling." 24 C.F.R. § 100.75(b). Discriminatory notices and statements "include, but are not limited to… [e]xpressing to agents, brokers, employees, prospective sellers or renters or any other persons a preference for or limitation on any purchaser or renter because of…familial status…." 24 C.F.R. § 100.75(c)(2).[13]

While the majority of Section 3604(c) case law "involve[s] allegations of 'steering' protected individuals away from certain housing opportunities and/or obviously discriminatory statements made to prospective renters," *see Pack v. Fort Washington II*, 689 F.Supp.2d 1237, 1245 (E.D. Cal. 2009), several courts have entertained Section 3604(c) claims based upon rules or restrictions published by entities such as homeowners' associations. *See Lath v. Oak Brook Condo. Owners' Ass'n*, No. 16-CV-463-LM, 2017 WL 1051001, at *8 (D.N.H. Mar. 20, 2017) (finding service dog policy actionable); *Fair Housing Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n, Inc.,* 136 F. Supp. 3d 1364, 1368 (S.D. Fla. 2015) (condominium rules alleged to discriminate against children); *Llanos v. Estate of Cohelo*, 24 F. Supp. 2d 1052, 1060 (E.D. Cal. 1998) (apartment complex rules that discriminated against children).

---

[13] The Court questions the applicability of the reasoning in *Morris v. W. Hayden Est. First Addition Homeowners Ass'n, Inc.*, No. 2:17-CV-00018-BLW, which purports to limit actionable publications to those provided to the buyers prior to the point of sale. The regulations include publications expressing to "sellers…or any other persons a preference…." The 2013 Handbook and pool sign could be construed as a discriminatory statement expressing to sellers or other persons a preference because of familial status. However, whether *Morris* is distinguishable was not presented to the Court.

The Hills have presented sufficient factual allegations in the record to survive summary judgment. River Run admitted that every homeowner is given a copy of the River Run Handbook, the CC&R's and the Architectural Committee Rules and Regulations when they purchase their home in the Subdivision. (Dkt. 40-2 ¶¶3-6; Dkt. 39-2 at ¶ 15.) Ms. Drake, the Association Manager, stated in her affidavit that each homeowner received a copy of the River Run CC&Rs from their realtor. (Dkt. 40-2 at ¶ 6.) Ms. Drake stated also that she was "directly involved in giving every new homeowner a welcome packet that included the River Run Handbook and the [Architectural Committee Rules and Regulations] when they purchase[d] their home." *Id.* Last, Brian Hill stated that the tennis court sign was clearly visible to any resident or guest. (Dkt. 42-4 at 2.) A reasonable juror could, therefore, infer based upon this evidence that prospective buyers and their real estate agents were provided with the written materials and would see the signs prior to the sale of a house within the subdivision.

The Court finds the Hills have met their burden upon summary judgment establishing a violation of Section 3604(c).

### (4) *The Hills Have Established Liability*

River Run argues the Hills cannot establish liability, because a finding that certain rules are discriminatory does not equate to a finding of liability under the FHA, nor does it entitle the Hills to recover damages. River Run asserts that, for the Hills to be entitled to damages, they must show the rules were enforced against them and other families with children. That is not, however, the law in the Ninth Circuit, as discussed above. *See also Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1172 (9th Cir.

2013) (citing 24 C.F.R. § 180.670(b)(3)(i) (HUD regulations recognizing availability of damages for "humiliation and embarrassment" in FHA cases); *Krueger v. Cuomo,* 115 F.3d 487, 492 (7th Cir. 1997) (tenant's testimony sufficient to establish FHA liability for emotional distress where her landlord's discriminatory actions made her "feel 'real dirty,' 'like a bad person,' and 'scared' her")); *Blomgren v. Ogle*, 850 F.Supp. 1427, 1440 (E.D. Wash. 1993) (rule per se discriminatory without proof that defendant had knowledge of the rule,... "[d]amages, however, may be imposed only where there is credible proof of harm proximately caused by the violation.").

The Court finds the Hills have set forth sufficient factual allegations to survive summary judgment and to support a claim for emotional distress damages. The Hills still bear the burden of proving damages at the time of trial.

**2.     River Run's Motion for Summary Judgment and its Related Motion to Strike**

**A.        Motion to Strike – Docket 53**

River Run moves to strike the Declaration of Brian Hill (Dkt. 48) submitted with the Hills' response in opposition to the motion for summary judgment, pursuant to the sham affidavit rule. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). The reasoning behind such a rule is, "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of facts." *Id*. However, the rule "does not automatically dispose of every case in

which a contradictory affidavit is introduced to explain portions of earlier deposition

testimony...rather the district court must make a factual determination that the

contradiction was actually a "sham." *Id*. at 266–67. Additionally, the inconsistency

between a party's deposition testimony and later affidavit must be clear and unambiguous

to justify striking the affidavit. Minor inconsistencies that result from an honest

discrepancy or mistake afford no basis for excluding an affidavit. *See Messick v. Horizon*

*Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

Brian Hill was asked during his deposition to recall whether there are fences that

encompass the back yards of any property on White Pine Lane. He testified he did not

know, and was not aware of any. (Dkt. 39-4 at 10.) Later, in his declaration, Mr. Hill

stated he observed fences in every phase of the Subdivision, and that fences were present

in the vicinity of his former home. (Dkt. 48 at 2.)[14] Mr. Hill also took photographs of

fences present in the subdivision.[15] Furthermore, the existence of fences throughout the

Subdivision is consistent with the evidence in the record. For instance, Tom Roush, the

Architectural Chair, indicated at the time the Architectural Committee was considering

the Hills' fence application that there are "fences ALL OVER the place on White Pine

---

[14] Although Mr. Hill did not state when he observed the fences, there are sufficient facts in the record for a reasonable juror to infer that fences existed throughout the Subdivision during the time the Hills lived at the Property.

[15] Mr. Hill does not indicate when he took the photographs. However, from the record, it appears Plaintiffs' counsel provided River Run with "photographs of fences and fence-like structures in River Run," having identified the fence photographs in Plaintiffs' initial disclosures. (Dkt. 50-3 at 3.) It therefore seems disingenuous for River Run to object to the introduction of these photographs via Brian Hill's declaration in these proceedings.

Lane." (Dkt. 49-1 at 32.) Roush stated that there are "at least three [such perimeter fences] in place now, including two high-visibility ones right on River Run Drive," and a "fourth one that existed for many years on a high-visibility lot on Pebblecreek." (*Id.*)[16] Put simply, the existence of fencing throughout the Subdivision, and on White Pine Lane, both prior to and during the time the Hills lived there cannot reasonably be disputed, and Brian Hill's declaration is not a "sham."

In addition, River Run seeks to strike statements in the Declaration regarding Mr. Hill's conversations with various architectural committee members during the time the Hills' fence application was pending, and which he could not specifically recall during his deposition. The Court need not rely upon the statements Brian Hill made in his declaration; rather, the Court will rely upon the affidavits of Chynna Simmons and Dannielle Drake River Run submitted; and the Declaration of Brian Ertz Plaintiffs submitted, and to which River Run did not object. (Dkt. 39-3, 40, and 49.)

The Motion to Strike (Dkt. 53) will be denied.

### B. Motion for Summary Judgment – Docket 39

River Run moves for summary judgment on the grounds that it did not discriminate against the Hills, or otherwise violate the FHA, with regard to the Hills' application to construct an enclosing fence in their back yard. River Run asserts the following arguments: (1) Section 3604(a), (b), and (c) do not apply, because River Run is an HOA and was not engaged in the sale or rental of housing when it denied the Hills'

---

[16] Emails containing the above quotations attributed to Tom Roush were submitted attached to the Declaration of Brian Ertz in opposition to River Run's motion for summary judgment.

fence application; (2) the Hills have failed to establish a prima facie case of

discrimination; (3) even if the Hills establish a prima facie case, River Run had a

legitimate, non-discriminatory reason for rejecting the Hills' fence application; (4) there

is no evidence that River Run's fence rules disproportionately impact families with

children;[17] and (5) there is no evidence River Run retaliated against the Hills within the

meaning of Section 3617.

### (1) *Post-Acquisition Discrimination*

Sections 3604(a), (b), and (c) apply to post-acquisition discrimination. River

Run's argument that the FHA was not designed to prohibit conduct that merely interferes

with a homeowner's later use and enjoyment of a dwelling contradicts binding Ninth

Circuit authority. *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583

F.3d 690, 713 (9th Cir. 2009); *Morris v. West Hayden Estates First Addition*

*Homeowners Association, Inc*., No. 2:17-cv-00018-BLW, 2017 WL 3666286 *2 n.2 (D.

Idaho Aug. 24, 2017) (noting the court in City of Modesto held that the FHA reaches

post-acquisition discrimination). At the hearing, River Run conceded there is a basis for

post-acquisition claims under section 3604. Accordingly, the Court will address this

argument only briefly.

The Hills' claim is that River Run denied the Hills' fence application, and imposed

different terms and conditions of approval for the same, because of their familial status.

---

[17] River Run argues also that there is no evidence River Run's rules or restrictions disparately
impact families with children. (Dkt. 39-1 at 21.) Plaintiffs do not advance a disparate impact
theory, and did not address the argument in their response brief. Accordingly, the Court has not
considered this argument.

The claim concerns the provision of services or facilities in connection with a dwelling, and is squarely addressed in Section 3604(b). *City of Modesto*, 583 F.3d at 713 (explaining the statute's inclusion of the phrase, "the provision of services or facilities in connection therewith," is broad enough to encompass the "many 'services or facilities' provided to the dwelling associated with the occupancy of the dwelling." *Id.*

The Hills claim that River Run engaged in conduct that effectively made their property unavailable to their family within the meaning of Section 3604(a). 24 C.F.R. § 100.60(b) provides that Section 3604(a) prohibits "[s]ubjecting a person to harassment because of…familial status…that causes the person to vacate a dwelling or abandon efforts to secure the dwelling." Although "[Section] 3604(a) does not reach every event that might conceivably affect the availability of housing," the statute "is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons." *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999).

In line with the reasoning in *City of Modesto*, the regulations applicable to Section 3604(a) clearly contemplate after-acquired conduct that results in constructive eviction— a resident cannot "vacate a dwelling" unless it is first occupied. Here, the Hills assert that River Run deviated from the procedures previously employed for considering applications to construct enclosing fences, and later changed the architectural rules to eliminate the option for enclosing fences in the Subdivision. A reasonable juror could

infer River Run's actions evinced a preference for homeowners without young children,[18] which effectively made the Hills' property unavailable to them, causing them to move.

Section 3604(c) applies also to the Hills' claim concerning the fence application.[19] Brian Hill testified in his deposition that he reviewed the Architectural Rules, including the requirements for enclosing fences, prior to purchasing the Property. The Architectural Rules contain an express statement directed at children, indicating their safety is not a "special circumstance" warranting an enclosing fence, but allowing for the construction of enclosing fences in "very special circumstances" for children's safety. A reasonable juror could infer that the rules concerning backyard fences limited the use and enjoyment of property by children. *See Fair Housing Congress v. Weber*, 993 F.Supp. 1286 (C.D. Cal. 1997) (permitting a claim to move forward under Section 3604(c) based upon similar rules and regulations because the rules expressed a limitation on the use of the apartment complex by children tenants, and an ordinary reader could not interpret otherwise).

### (2) *Prima Facie Case of Discrimination – Disparate Treatment*

The Hills contend the circumstances surrounding the rejection of their fence application demonstrate discrimination based on familial status. To prove discrimination under a disparate treatment theory, "the prima facie case elements are: (a) plaintiff is a

---

[18] It is difficult to conceive of any other reason for a fence enclosing the patio and yard area, other than to allow for play space, and for the protection and safety of children and pets. While the Architectural Rules expressly provided (and still provide) for "privacy fence/screen[s],"such fences are limited to enclosing only patios and decks, or screening utilities and trash containers. Thus, it would provide a limited enclosed space of a hard surface area (concrete or wood/composite decking), and may not allow children and pets to enjoy the entire yard area.

[19] The Court discussed above that Section 3604(c) applies to the Hill's claim related to the Recreation Center rules published in the Handbook and the tennis court sign.

member of a protected class;[20] (b) plaintiff [submitted a fencing application] and was qualified to receive [a fence]; (c) the [fencing application] was denied despite plaintiff being qualified; and (d) defendant approved a [fencing application] for a similarly situated party during a period relatively near the time plaintiff was denied. . . ." *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997). *See also Reynolds v. Quarter Circle Ranch, Inc.*, 280 F. Supp. 2d 1235 (D. Colo. 2003) (applying *McDonnell Douglas* burden shifting framework to plaintiffs' FHA claims arising from attempt to gain architectural committee approval of plans to build a house).

In lieu of satisfying the elements of a prima facie case, a plaintiff may also "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the challenged decision. *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122–23 (9th Cir. 2004) ("[I]t is not particularly significant whether [a plaintiff] relies on the *McDonnell Douglas* presumption or, whether he relies on direct or circumstantial evidence of discriminatory intent to meet his [initial] burden")); *see also Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (stating that a plaintiff suing under 42 U.S.C. § 1981, like a plaintiff bringing a suit for disparate treatment, may proceed under the *McDonnell Douglas* framework or by producing direct or circumstantial evidence showing that a discriminatory reason "more likely than not" motivated the employer). Under either method, however, the plaintiff must counter the

---

[20] It is undisputed that the Hills are members of a protected class.

defendant's explanation with some evidence suggesting that the challenged action "was due in part or whole to discriminatory intent." *Budnick,* 518 F.3d at 1114 (quoting *McGinest*, 360 F.3d at 1123).

River Run argues the Hills cannot prove the second and third elements of their prima facie case, because the Hills did not submit a complete application; River Run did not issue a decision on the application appeal; and, there is no evidence of similarly situated applications being approved. In response, the Hills argue there are disputed issues of fact with respect to the motive for denying the Hills' fence application. Alternatively, the Hills argue the fence application was adequate and other similarly situated applicants were treated more favorably.

The Court finds the Hills point to numerous pieces of evidence that raise a triable issue of fact whether River Run's reasons for denying the Hills' fence application were more likely than not motivated by a discriminatory intent. For instance, the Architectural Committee Rules were amended to allow fences, in contravention of the stated purpose to maintain a "park like setting," for several other purposes, such as sound abatement; geese control; and privacy. Shortly after the Hills submitted their fence application for the stated purpose of ensuring their children could play safely in their backyard, the Architectural Committee decided to eliminate all enclosing fences. Numerous emails exchanged after the Hills submitted their fence application referred to the "changing demographics" of the subdivision, and "protecting the property values of the homeowners." When read in context, the statements appear to infer that more families

with children were moving to River Run, and that fences to ensure children's safe play should not be allowed. (*See, e.g.*, Dkt. 49-1 at 13-21.)

Additionally, even under a traditional *McDonnell Douglas* analysis, the Court finds material facts regarding motivation for the denial, and whether the reasons were pretextual, are disputed. The Hills' first fence application was denied, ostensibly because it was missing the "required" landscaping element. However, Tom Roush indicated in an email directed to the Architectural Committee members that the committee has "never required a homeowner to submit an acceptable project proposal before we review and vote on it." (Dkt. 49-1 at 4; 49-2 at 21-22.). David Holm testified in his deposition that, during his time on the Architectural Committee, residents submitted applications that were missing required elements. (Dkt. 39-11 at 8.) Docket 49-9 contains incomplete applications from other River Run homeowners that the Architectural Committee considered. Tom Roush noted that the Architectural Committee had, in the past, ignored the landscaping requirements for privacy screens and enclosing fences. (Dkt. 49-1 at 20.) And, there is evidence the Architectural Committee knew the Hills' neighbors specifically requested there be no landscaping. (Dkt. 49-6 at 5; *see also* 49-6 at 6.)

Accordingly, the Court finds there is evidence in the record from which a juror could reasonably infer that the denial of the Hills' application, based upon the lack of the landscaping element, was pretext for familial status discrimination.

Next, River Run argues it never issued a decision on the Hills' appeal of the fence application, and therefore never denied it, asserting the Hills did not complete the application process and therefore cannot maintain a case for discrimination. The facts

here are disputed. The Hills' first application was denied with a vote of 6:1. The Hills

next submitted what they considered to be a new application, and asked that it be treated

as such. Instead, the Architectural Committee indicated it was treating the Hills' second

application as an appeal, which would be presented to and considered by the Executive

Board. Yet, the Architectural Committee Rules contain no appeal procedure. No vote

appears in the Executive Board's January 20, 2015 meeting minutes or at any time after

the application's submission. If indeed there was never a vote, then an inference could be

made, as argued by the Hills, that the second application (or appeal) was approved.

Thereafter, upon notice that the Hills would be proceeding with construction, Mr. Cox

threatened Brian Hill on January 6, 2015, with litigation.

The Court finds there is a dispute as to what action, if any, was taken by the

Architectural Committee or the River Run Executive Board at its January 2015 meeting.

The Court finds also that a reasonable juror could infer that River Run did not follow its

own CC&Rs and rules, and unilaterally changed them to the detriment of the Hills.

Last, there is sufficient evidence before the Court upon which a reasonable juror

could infer that similarly situated applications considered near the time of the Hills'

application were treated more favorably. *See Gamble*, 104 F.3d at 305 (requiring

evidence that a permit was granted to a similarly situated party relatively near the time of

the applicant's denial). First, there is ample evidence in the record that fences existed

throughout the subdivision. This evidence includes a photograph of a wrought iron

enclosing fence projecting into the rear yard, similar to the fence proposed by Brian Hill. (Dkt. 48-2 at 22.)[21]

Next, there is evidence River Run approved non-conforming fences near the time the Hills submitted their application. For instance, the Architectural Committee approved an application from Mike K. for a fence to inhibit geese, dated August 20, 2013, despite the fact the fence did not meet River Run's rules at the time. (Dkt. 49-2 at 19.) The architectural rules were later changed to expressly allow this type of fence. Mike M. submitted a fence application on July 14, 2014, that did not meet the Architectural Rules, yet his application was approved. *Id.*[22] And Tom Roush recalled that enclosing fences "had been permitted over the years." (Dkt. 49-2 at 21.)

The Court finds that, viewing the facts in the light most favorable to the Hills, a reasonable juror could conclude River Run had approved non-conforming fence applications, and allowed enclosing fences, at or near the time of Mr. Hill's application on October 19, 2014. The Hills have presented sufficient facts demonstrating similarly situated persons without children were treated more favorably when they requested to build fences. *See Reynolds v. Quarter Circle Ranch, Inc.*, 280 F. Supp. 2d 1235, 1243 (D.

---

[21] It is not clear from the record when this particular wrought iron fence was constructed or why. However, construing the evidence in the record in favor of the Hills, the fact it existed at all, and was similar to the design proposed by Mr. Hill, may be construed by a reasonable juror as constituting favorable treatment to other similarly situated applications.

[22] Marv and Francis applied to construct a fence to enclose their entire yard on or about June 15, 2015, after the re-write to the rules eliminated that option. (Dkt. 49-2 at 27.) Their application was allowed to proceed, and Danielle Drake indicated that the Board of Directors "will look favorably on approving it given the other fences on nearby units." *Id.* The Architectural Committee approved an enclosing fence at 1981 S. Springbrook Lane in September of 2017, for the purpose of providing for the safety of a special needs adult and two small dogs. (Dkt. 49-10 at 4.)

Colo. 2003)("[T]he requirement of producing evidence of a similarly situated party does not mean the plaintiff must produce an identical match: 'When comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of 'comparable seriousness.'").

### (3)    *Non-Discriminatory Reason*

River Run argues it had multiple legitimate and non-discriminatory reasons for seeking to limit the type of fence the Hills sought to place on their property. However, there are genuine disputes as to the material facts regarding River Run's alleged non-discriminatory reasons for rejecting the Hills' fence application. Several documents suggest that members of the Architectural Committee and Executive Board considered the "changing demographics" of the subdivision; changed the architectural rules applicable to fences to eliminate enclosing fences in response to the Hills' application; and did not discuss alternatives to the Hills' proposed fence. Rather, River Run voted to eliminate the type of fence that a reasonable juror could conclude would most effectively provide for children's safety and enjoyment.

### (4)    *Retaliation*

To establish a prima facie case under Section 3617, "a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001).

River Run construes protected activity too narrowly, arguing that conduct predating the July 16, 2015 HUD complaint[23] is irrelevant to the Hills' retaliation claim and therefore not actionable. However, the retaliation claim is based upon the Hills' desire to enjoy their home free from familial status discrimination, and there is evidence the Hills exercised their right to do so prior to the filing of their HUD complaint.

The Hills' first fence application expressly stated that they sought to construct an enclosing fence "for the safety of children." (Dkt. 49-5 at 2.) After the first application was denied, the second submittal mentions the safety of the Hills' children as a reason for the fence application, and explains that a patio fence "works great for adults, but doesn't really work as well for kids. I suppose that is why there is  separate fence category specifically for children, the enclosing fence…[allowing] room for kids to move around and play." (Dkt. 49-6 at 1.) The letter authored by neighbors Bill and Pat Kolb states that they "welcome the Hills and their beautiful young children, they are such a delight and wonderful addition to our aging community." (Dkt. 49-6 at 5.) The letter authored by the Hills' other neighbors, the Penningtons, states that when "discrimination becomes part of the narrative, it is time to re-address 20 year old bi-laws. This is not a 55 and older designated neighborhood….We hope you consider the needs of the younger families, that are moving to Idaho and welcome them with open arms." (Dkt. 49-6 at 6.) River Run was therefore put on notice that the Hills were contesting the initial denial of their application

---

[23] The Hills filed their HUD Complaint on May 27, 2015, and amended it on July 16, 2015.

based on familial status, and exercising their right to have their application considered free from familial status discrimination.

A reasonable juror may also infer adverse action. After the denial of the Hills' first application and the submission of the revised application, the Hills' attorney on December 19, 2014, notified River Run it was in violation of its CC&Rs by failing to vote on the second application within twenty days, and therefore the second application was deemed approved and the Hills would be proceeding with construction of the fence. (Dkt. 40-13.) On January 6, 2015, Lloyd Cox wrote to Brian Hill, stating that the Executive Board exhibited "no willingness to consider an alternate enclosing fence." (Dkt. 49-19 at 1.) Mr. Cox threatened litigation, stating: "Speaking for the Executive Committee and knowing the attitude of the Board members, I can assure you RRHOA will litigate the matter should you choose to construct the fence as stated by your attorney." (Dkt. 49-19 at 2.)

Thereafter, evidence in the record indicates Brian Hill engaged in a discussion with members of the Executive Committee sometime after January 6, 2015, and that it was clear to him "the Executive Committee will not compromise on any type of enclosing fence for any child under any circumstance, even though the enclosing fence has been an allowed category of fence for years and years." (Dkt. 40-12 at 10.)

The above evidence may be construed by a reasonable juror as evidence of protected activity, and evidence that River Run threatened, intimidated, and interfered with the Hills' enjoyment of their right to be free from familial status discrimination. At the very least, there are disputed issues of fact as to why River Run acted in the manner it

did, in light of the existence of similar fences throughout the neighborhood. Thus, there is evidence in the record sufficient to preclude summary judgment with respect to the three elements required to prove the retaliation claim under Section 3617.

And last, there is evidence upon which a reasonable juror could find a causal link between the Hills' protected activity and the adverse action.[24] The Hills claim they could not enjoy their home because their young children could not play safely in their yard, which backed up to a creek.[25] They felt uncomfortable going to the pool and viewing the signs around the common areas. And the Hills saw all sorts of other fences, including fences to keep out geese, but they were not allowed to construct a fence enclosing their back yard for their children's safety and enjoyment according to established Architectural Rules. As a result, they moved.

---

[24] River Run did not address IFHC's claimed damages other than in the context of its argument regarding standing in Section III (C). And, Plaintiffs did not move for summary judgment on damages.

[25] Brian Hill stated also in his declaration that the community pool backed up to the backyard of the Property, and his children could fit through the pickets of the pool fence. (Dkt. 48 at 2.)

## CONCLUSION

The Court concludes there are no disputed issues of material fact precluding partial summary judgment on Plaintiffs' motion. The Hills and IFHC have established liability under 42 U.S.C. §§ 3604(b) and (c) for River Run's discriminatory tennis court sign, pool guest rule, and adult only clubhouse rule. That leaves the issue of damages for trial on these claims. Conversely, the Court finds there are genuine issues of material fact concerning Plaintiffs' claims under 42 U.S.C. §§ 3604(a), (b), and (c), as well as under 42 U.S.C. § 3617, related to the Hills' application to construct a fence in their backyard for the safety and enjoyment of their children. Defendant's motion for summary judgment will therefore be denied.

The Court will contact the parties to discuss a trial setting.

## ORDER

1) Defendant's Motion for Summary Judgment (Dkt. 39) is **DENIED.**

2) Plaintiffs' Motion for Partial Summary Judgment (Dkt. 42) is **GRANTED**.

3) Defendant's Motion to Strike (Dkt. 50) is **DENIED**.

4) Defendant's Motion to Strike (Dkt. 53) is **DENIED**.

DATED: February 7, 2020

Honorable Candy W. Dale
United States Magistrate Judge